## Howard v. Commonwealth of Pennsylvania, State Police

*Howard A. Specter, Elaine Specter* and *Bruce Smith,* for plaintiffs.

*Frank J. Micale* and *Robert T. McDermott,* for the commonwealth.

THOMAS, *P.J.*, July 26, 1986—This was a jury trial involving an intersection automobile accident with a vehicle driven by Jeffrey M. Howard and a Pennsylvania State Police automobile, driven by Sanford Porter. The accident occured about 7:50 a.m. on August 31, 1984, when the state police vehicle went through a stop sign on a rural route and struck plaintiff's vehicle as it was proceeding south on a main two-lane highway designated as Pennsylvania Route 8. The jury awarded substantial damages to plaintiff husband, and defendant filed post-trial motions contending there were four reasons why the court should have granted a compulsory nonsuit or directed verdict and nine major errors by the court which singularly or collectively require the grant of a new trial.

## FACTUAL BACKGROUND

We adopt, with some modification, plaintiffs' statement of facts as contained in their post-trial argument brief as being an accurate representation of the pertinent facts surrounding the accident viewed in the light most favorable to the verdict winner. At about 7:50 a.m. on the Friday of the 1984 Labor Day weekend, Trooper Sanford R. Porter was driving a Commonwealth state police vehicle eastwardly along Canadohta Lake Road, also known as Pennsylvania Legislative Route 20084. Porter's vehicle was the lead car in a caravan of three state police

vehicles on their way to a special emergency assignment in Warren, Pa. Although he was unfamiliar with the road, Porter set the pace for the other officers. The unfamiliar road was winding and rolling, and Porter encountered patches of fog the farther east he went. At the same time the sun was rising in the east and, although he encountered the sunlight as soon as he turned east onto Canadohta Lake Road, the farther he went, the more the sun became a problem as he headed directly into it. He testified that he had to pay more attention to staying on the road than to looking for road signs. Porter admitted that his maximum visibility was only 50-100 feet and that he could never see more than 100 feet ahead in the constant fog. He also acknowledged that his speed was between 40 and 60 m.p.h. all along the way and that he was unaware of the posted 45 m.p.h. speed limit because he never saw any of the speed limit signs.

Although the officers were on their way to assist in a manhunt, they were not actually in pursuit of the fugitives. Porter was in a marked police cruiser equipped with a strobe light and a siren. Although he knew that he was required to use a siren in order to go through a stop sign or exceed the speed limit, he was not using his siren along Canadohta Lake Road or at any time as he approached the intersection with Route 8.

Not only did Porter fail to see the several posted speed limit signs, he also failed to see signs along the road signalling the presence of the intersection of Route 8, which was marked with a stop sign. There was also a standard "Stop Sign Ahead" warning sign posted in clear view 340 feet ahead of the stop sign. Porter claimed to have seen what he believes to have been the stop sign as a "glimmer of red" at almost the same time he saw Jeffrey

Howard's pickup truck in front of him in the intersection and applied his brakes. He testified that it was "almost an instantaneous thing" between the time he saw the red and applied his brakes and the time he saw plaintiff's vehicle directly ahead of him and already in the intersection.

The investigating officer who measured the 164 feet of skidmarks left by Porter's vehicle up to the point of impact in the center of the intersection estimated Porter's speed to have been 55 m.p.h., 10 miles over the posted limit. The commonwealth never denied these facts.

Porter knew that both Route 8 and a stop sign were somewhere ahead on the unfamiliar road. During a radio conversation with one of his companions right before the collision, he said that Route 8 was somewhere up ahead, but he claimed not to know precisely where it was. Porter did acknowledge that he could have radioed the police barracks to determine the location of the intersection, but that he failed to do so. He testified that he went through the stop sign because he didn't know the intersection was there. He attempted to justify his ignorance of the terrain, the intersection, the warning sign and the stop sign by relying on his increasingly obscured vision because of the patches of fog and the increasing intensity of the rising sun. He never slowed down, however.

Significantly, Trooper David Lash, the driver of the third car in the caravan, saw the warning and stop signs and stopped his car at the intersection. He slowed down because of the rough road and the sun. It was argued to the jury that Porter could and should have done the same thing. Instead, he sped through the stop sign and hit plaintiff's truck broadside.

While the area of the accident was in a rural area,

that area was a resort area and there were numerous homes, stores, a church, small shops and an amusement park along the route immediately before the intersection.

Trooper Porter was aware of the statutory mandate requiring emergency vehicles to use audible signals (sirens) when exceeding the speed limit or going through stop signs and the provision that no emergency privilege relieves an officer of the duty to drive with due regard for the safety of all persons. In fact, he identified plaintiff's exhibit 26 as the written rules governing his conduct. In spite of Porter's testimony and the clear statutory mandate, the commonwealth sought to prove an unwritten custom among state police officers to disregard the language of section 3105. The trial court ruled that Porter could not testify to any such policy to leave the use of the siren to a speeding officer's discretion when approaching a stop sign.

Plaintiff Jeffrey Howard was on the way from his work at General Electric in Erie to his home along Route 8. The speed limit on Route 8 was 55 m.p.h., and Howard was traveling at 45-50 m.p.h. Traffic was very light. The weather was nice and sunny, although he had slowed down and had his light on because of a few small patches of fog along another road which he had traveled earlier. He had no recollection of anything after passing a landmark about a quarter-mile mile ahead of the intersection. His first memories after impact are of pain, blood on his face, glass on his body, the fear involved in not being able to move and the fear of being permanently paralyzed. According to his treating physician, he lost a portion of his memory as a result of the trauma.[1]

---

1. Dr. Michael Hartman, plaintiff's treating orthopedic surgeon, testified via a videotape deposition taken January 31,

Howard sustained fractures of his sixth cervical vertebra, his first lumbar vertebra and his right hip, in addition to lesser injuries. He was bedridden for two months, wore a back brace and used a walker, went through various regimens of physical therapy and ultrasound treatment, and continues to take medication for ongoing pain. After finally returning to work in December of 1985, he found the job he had been doing for more than 11 years physically difficult and painful. His lowered efficiency resulted in a reduced take-home pay and lost valuable seniority and pension time.

The jury awarded plaintiff husband total damages of $266,700, broken down into separate items listed on the verdict slip in accord with the court's charge on damages as follows:

| | |
|---|---|
| Lost wages to date of trial | $36,000 |
| Lost future earning capacity | 75,000 |
| Past and future pain and suffering | 105,000 |
| Loss of enjoyment of life | 45,000 |
| Damages to truck | 5,700 |
| | $266,700 |

The verdict was later molded to reflect a payment of work-loss benefits under plaintiff husband's policy of $15,000 and plaintiff's willingness to accept the $250,000 statutory limit imposed in the Act of October 5, 1980, P.L. 693, §221(1), 42 Pa.C.S. §8528(b). To this $250,000 maximum allowable award was added delay damages under Pa.R.C.P. 238 in the amount of $11,438.36, resulting in a molded jury award of $261,438.36.

---

1986. "Depo._____" references refer to pages of that deposition, the tape of which was made a part of the record as exhibit 27.

The jury declined to award damages to Jeffrey Howard's wife in a separate verdict.

## MOTION FOR JUDGMENT N.O.V.

In the post-trial relief motions, defendant alleged four reasons why the court erred in failing to grant a judgment n.o.v. or a directed verdict. In their argument brief, however, they have reduced their reasons to two, alleging that:

"(a) Plaintiffs' evidence failed to establish the driver of the state police vehicle fell below standard of care applicable to a police officer acting in an emergency situation, under Vehicle Code at 75 Pa.C.S. §3105.

"(b) It is contended that judgment n.o.v. should have been entered in favor of defendant because the evidence established that the operator of the state police vehicle was confronted by a sudden emergency which exculpated his conduct in going through the stop sign and striking plaintiff."

Police officers on emergency missions are covered under section 3105 which in pertinent part reads as follows:

"§3105. Drivers of emergency vehicles

"(a) General rule.—The driver of an emergency vehicle, when responding to an emergency call or when in pursuit of an actual or suspected violator of the law or when responding to but not upon returning from a fire alarm, may exercise the privileges set forth in this section, but subject to the conditions stated in this section.

"(b) Exercise of special privileges—The driver of an emergency vehicle may:

"(1) . . . .

"(2) Proceed past a red signal indication or stop sign, but only after slowing down as may be necessary for safe operation. . . .

"(3) Exceed the maximum speed limits so long as the driver does not endanger life or property. . . .

"(4) . . . .

"(c) Audible and visual signals required. — The privileges granted in this section to an emergency vehicle shall apply only when the vehicle is making use of an audible signal and visual signals. . . .

"(d) . . . .

"(e) Exercise of care. — This section does not relieve the driver of an emergency vehicle from the duty to drive with due regard for the safety of all persons."

At trial and again in its post-trial brief, defendant cites and seemingly relies on *Junk v. East End Fire Department,* 262 Pa. Super. 473, 396 A.2d 1269 (1978). As was argued and pointed out at the time of trial, *Junk* was decided under the 1959 Vehicle Code and the standards applicable to the operators of emergency vehicles at that time was later modified in the 1976 Vehicle Code. As the court noted in *Junk,* the amendatory language in the 1976 code "appears to signal an increase in the duty placed on operators of emergency vehicles, and a decrease in the burden placed on plaintiffs bringing actions pursuant to this section." *Junk,* supra, 483 n.2.

Reviewing our charge under section 3105 and in view of the factual situation surrounding this accident as noted previously, we could find no basis for a compulsory nonsuit at the time of trial, and on review of the case citations and argument in the post-trial brief, we find no reason to now grant judgment n.o.v. on this ground.

The second n.o.v. argument contends that under the facts of the case the trooper was confronted with a sudden and unexpected emergency that put him in a perilous situation that exonerated him from using the highest or even an ordinary degree of

good judgment. It is argued that the emergency nature of his mission, compounded by fog and a blinding sun, created an emergency situation that excused his conduct. It must be remembered, as noted in a recital of the facts, that the trooper knew that somewhere ahead of him there was an intersection with a major traffic route; that he had encountered previous patches of fog, and that whether the fog was more or less dense immediately before the intersection was a foreseeable fact; that his speed in excess of the speed limit, even though on an emergency assignment, was not excusable in view of the atmosphere and road conditions; and that it certainly was a jury question whether he was justified under the surrounding circumstances in not observing the stop sign itself and the other sign placed at roadside warning that there was a stop sign ahead. In view of the language of section 3105, particularly subsection (e) requiring operation of an emergency vehicle with due regard for the safety of all persons, we found no room to grant a compulsory nonsuit at the trial and on further reflection and an analysis of the cases cited by both parties, find no error in said decision. We simply cannot find that the known atmospheric conditions of sun and fog, which conditions had been encountered by the driver over a distance of several miles before the intersection, created such a "sudden emergency" so as to exculpate him from his negligent operation as a matter of law.

## MOTION FOR NEW TRIAL

Defendant has filed nine additional reasons alleging such serious court error as to warrant a new trial. We find none of them of sufficient merit to award a new trial and will discuss only six of these reasons in any detail.

*A New Trial Should Be Granted Because*
*The Court Neglected To Charge On The*
*"Sudden Emergency" Doctrine*

This theory is that Trooper Porter faced a sudden emergency when the blinding sunlight, in conjunction with fog, temporarily blinded him as to his whereabouts at the intersection, thus superseding his obligation under section 3361 to drive at a safe speed under conditions then and there existing to the net effect that there was a sudden momentary emergency created that excused his compliance with section 3361, requiring him to drive in such a manner as to bring his vehicle to a stop within the assured clear distance ahead. This disingenuous argument ignores the fact that the trooper's testimony clearly shows that sun and fog did not "suddenly" confront him, but was an existing physical fact that he had encountered in increasingly severe proportions as he approached the accident scene. He testified that as they went further east they encountered more and more fog; he knew the sun was coming up, and he started to encounter more sunlight the farther east he went and that the farther east he went the sun became an increasing problem; that his maximum visibility as he approached the scene was 50 to 100 feet and that his speeds were between 45 and 60 m.p.h. and that he knew he was approaching a major north-south intersection somewhere ahead. Thus, by no stretch of the imagination could the combined sun and fog condition that Porter was encountering be considered a sudden emergency and certainly is not comparable to the standard sudden emergency situations, such as a dart out pedestrian, a deer jumping onto the highway, a suddenly veering oncoming car, a preceding truck suddenly disgorging its load, or the sudden unantici-

pated loss of breaking power. Under all of the facts of the case, we felt a sudden emergency charge was not appropriate and find no error in refusing to give the same to the jury.

### The Court's Charge On Section 3323

Seemingly, defendant now argues that the court's charge to the jury regarding a vehicle driver's obligation to stop at a stop sign was improper because of Porter's testimony that he was momentarily blinded by sun and fog, and therefore was excused from stopping. Apparently, defendant's theory is that this instruction to the jury on section 3323, 75 Pa.C.S. §3323(b), was improper in view of the fact that defendant postulated that the "sudden emergency" precluded him from seeing either the stop sign or the previous sign warning that there was a stop sign ahead. We find no merit to this contention.

### The Court Committed Error In Charging On The One-And-A-Half Rule

With all the instruction on various sections of the Vehicle Code and extensive testimony of the crucial facts, the court decided, sua sponte, to instruct the jury on the one-and-a-half rule. This well known mathematical truism simply establishes that a vehicle travels in feet per second approximately one and a half times its speed.

Defendant contends that the recital of this rule unduly focused jury attention on the police-vehicle speed without allowing defendant to adequately develop the emergency situation that required undue speed under the surrounding circumstances. The jury was confronted with a mass of testimony and exhibits describing the road, signs, skid marks and the speed of two or more vehicles, as well as an ex-

planation of the emergency situation the police were proceeding to. While this specific charge was not requested, we felt an obligation to explore it with the jury to assist them in more intelligently analyzing the testimony and the arguments of counsel. We find no error in enlightening the jury in this area.

### *A New Trial Should Be Granted Because Of The Court's Refusal To Charge On Contributory Negligence*

We did not charge under the Comparative Negligence Doctrine (42 Pa.C.S. §7102) that the jury could consider in diminution of damages the contributory negligence of plaintiff. This charge was requested and refused simply because the court and the jury heard no evidence from which it could be concluded that plaintiff was contributorily negligent in causing the accident. Defendant's brief now urges that the flashing lights on the police vehicle as it approched the intersection, the physical layout of the intersection, the fact that plaintiff could have seen a vehicle approaching from the right, plaintiff's familiarity with the location of the intersection, and prevailing weather conditions are factors that warranted submission of the contributory negligence to the decision of the jury. While these arguments may be cogent in a post-trial brief, it must be remembered first of all that plaintiff husband suffered traumatic amnesia and had absolutely no recollection of how the accident happened, so the jury did not have the benefit of plaintiff husband's recollection of the facts at the crucial time immediately before impact. Further, there was not one scintilla of evidence produced by defendant to show that the flashing lights operating on Porter's car as it approched the intersection could have been seen for

any distance as plaintiff's vehicle approached the intersection from the north. There was some evidence of a cornfield at the intersection, but no testimony as to the height of the corn or the degree to which it blocked the view of plaintiff husband to see vehicles approaching on the side road. Testimony showed plaintiff husband to be operating the vehicle immediately before the intersection within the speed limit and the police investigation and testimony did not disclose any measurements or experiments disclosing the view (even in perfect weather conditions) that plaintiff husband had as he proceeded south on Route 8 toward the intersection.

To have charged the jury from the evidence they heard that they could find contributory negligence on the part of plaintiff husband would have invited them to guess at any real or imagined negligence on the part of plaintiff husband, and, accordingly, no charge on contributory negligence was appropriate in this case. The trial courts have been continuously cautioned not to charge a jury on contributory negligence in the absence of any evidence to support such a finding. See *DeJohn v. Orell,* 429 Pa. 359, 240 A.2d 472 (1968); *Hanlon v.. Sorensen,* 289 Pa. Super. 268, 433 A.2d 60 (1981); *Thomas v. Tomay,* 413 Pa. 270, 196 A.2d 740 (1964).

*A New Trial Should Be Granted Because The Trial Court Admitted Evidence Concerning A Prior Accident Involving A State Police Vehicle At The Same Intersection As The Present Case*

Defendant lays great stress on this alleged prejudicial error when we allowed limited exploration of Trooper Porter regarding his knowledge of another accident involving a state police vehicle seven years earlier at the same intersection. The complete chambers discussion regarding the admission of the

previous accident and the court's ruling as to why it would allow limited exploration can be found in the transcript, pages 245-249. Normally, evidence of other accidents at the same locale are inappropriate for the jury's consideration, but the court felt the peculiar factual circumstances of this case warranted an exception. It must be remembered that Porter had testified that as he was speeding along in the three car caravan he entered an area he was not completely familiar with because it was outside of his normal patrol areas. The "other accident" strangely enough involved another police officer by the name of Gambino, and naturally defendant did not want any evidence of this prior accident at the same intersection by another police officer brought to the attention of the jury. However, since Porter was contending he was almost totally unfamiliar with the terrain and the roads, plaintiff wanted to establish that at least he knew that he was approaching a major north-south road (Route 8), and that he knew that somewhere ahead of his speeding vehicle was an intersection whereby he had to cross Route 8. Plaintiffs then wanted to question the trooper in a limited fashion of his knowledge of the prior state police accident at this intersection to lay the groundwork for questioning Porter and establishing that while he was not intimately familiar with the roads he was travelling on, he did know that ultimately he would be coming to a stop intersection with a main traffic route. We severely limited counsel's exploration of the former accident. We find no error in allowing evidence of this prior accident to be heard by the jury for the limited purpose of attempting to convince the jury that the driver of the state police car had notice of a dangerous intersection in close proximity to where Porter was encountering difficulty with road and sign identifica-

tion, and his vision was limited because of fog and sun.

We found no error in permitting limited exploration of Porter's knowledge of this prior accident and its general location under the facts of this case, and believe our ruling lay within the sound discretion of the trial court and find no error therein.

## A New Trial Should Be Granted Because The Court Permitted A Separate Award For Pain And Suffering And For Loss Of Enjoyment Of Life

As previously noted in the opening narrative, we attempted to aid the jury in reaching a decision by separately itemizing on the verdict slip the awards they would be entitled to make in event of a verdict for plaintiffs. As we previously noted, one of these elements was an award for past and future pain and suffering and another was a separate award for loss of enjoyment of life.

It must be remembered that plaintiff husband was traumatically injured in this case, with multiple fractures and cuts, and the record is vivid with the anguish, pain and suffering he underwent during the recovery period. Additionally, defendant testified rather extensively as to those activities he enjoyed engaging in before the accident and which he could no longer participate in, either totally or to the extent he would desire. He enjoyed cross-country skiing, dirt bike riding, hiking and particularly enjoyed engaging in active construction projects on behalf of his church in building and repairing houses. There is no doubt the jury could have found that the accident considerably limited his hobbies and leisure time activities and we find no error in our instruction that pain and suffering and loss of enjoyment of life are recoverable items of damages, whether they are all lumped together under the tra-

ditional category of "pain and suffering," or whether the general term pain and suffering, is subdivided into its various components. Indeed, in our charge we very carefully delineated these elements and instructed the jury not to duplicate the award. We note the following from our charge, as found on page 426-428.

"Now, we don't get much better because now we're getting into another imprecise area, generally known as pain and suffering. Both the pain and suffering he had in the past and what he will incur in the future.

"Legal scholars and courts have struggled over the years to attempt to define what we mean by the general term, and most courts and legal scholars say that three words, pain and suffering, include a lot more than just those words.

"Included in this term, pain and suffering, is a wide variety of general damages that may have been incurred, including physical pain, mental anxiety, physical and mental suffering, inconvenience, inability to do routine living tasks with their former efficiency, and other indirect or understandable residuals resulting from the accident that had it not happened, wouldn't have plagued plaintiff. . . .

"Now, the next element, loss of enjoyment of life, many times by judges and legal scholars is included as another element of pain and suffering, but I thought we listed it separately here because there was some testimony from plaintiff about life's enjoyments that he no longer feels he can perform or participate in because of his residual injuries. You are entitled to adequately compensate him for these if you don't consider them as part of the pain and suffering.

"You will recall he talked about himself as being a pretty active person, and I guess his wife verified

that. We don't have a market value for that that we can look up, that's left to your discretion. You will recall he said he enjoyed cross-country skiing and hiking and working and church volunteer construction projects and riding his dirt bike, his cross-country bike, and doing other projects of that nature. It's for you to determine when or what degree the ability to reacquire these pleasurable life pastimes and hobbies will occur. And if he has been damaged because he can't do the enjoyable things that he formerly did before the accident, he is entitled to be compensated for that in an amount that you feel is fair, equitable, and just. . . ."

We find the case relied upon by defendant of *Willinger v. Mercer Catholic Medical Center,* 482 Pa. 441, 393 A.2d 1188 (1978), to be inappropriate, as this case dealt with the wrongful death and survival action in which it was determined the trial court had committed error when it instructed the jury it could separately award damages for loss of life's pleasure by *the decedent.*

We find no error in our handling of these elements of damage and our charge to the jury thereon.

### A New Trial Should Be Awarded Because The Molded Verdict Included Delayed Damages Under Rule Of Civil Procedure 238

Defendant's argument is that delay damages under Rule of Civil Procedure 238 cannot be awarded against the commonwealth because said type of damages are not specifically enumerated in the immunity statute which allows maximum individual recovery of $250,000, 42 Pa.C.S. §8528(b). We find no legislative intent to exclude the commonwealth from the payment of delay damages permitted under rule 238 and, absent a clear legislative intent to

exclude the commonwealth and its subdivisions from the provisions of rule 238, we see no reason why the commonwealth, when a party defendant in a lawsuit, should not be treated the same as any other defendant.

For the foregoing reasons, we find no reason to grant judgment n.o.v. or a new trial and accordingly dismiss defendant's motions.

### ORDER

And now, July 23, 1986, for the foregoing reasons, defendant's post-trial relief motions are denied, and we sustain the molded verdict in favor of plaintiff husband.